Decree for libellant for $100, with interest at 6 per cent., and costs.

----

FIRST NATIONAL BANK OF LACON *v.* BENSLEY and others.

*(Circuit Court N. D. Illinois. ———, 1880.)*

DRAFT — AGREEMENT TO ACCEPT — CONDITIONS — MUST BE COMPLIED WITH.—Where an agreement was to pay the draft of J. B. & Bro., with bills of lading attached, *held,* that to make the promissor liable thereon there must be a literal compliance with the conditions, and the presentation of a draft drawn by A. D. B. & Bro., or one unaccompanied by bills of lading, was not sufficient compliance, although the names J. B. & Bro. and A. D. B. & Bro., were used by the same firm interchangeably, and the property represented by the bills of lading to be attached came into the possession of the promissor.

CONDITIONAL CONTRACT—ACTION TO ENFORCE—BURDEN OF PROOF.— In an action to enforce a special and conditional contract, the burden is on the plaintiff of showing an actual compliance with the conditions imposed.

DRAFT — AGREEMENT TO ACCEPT — WHEN MUST BE PRESENTED. — Where no time is specified within which a draft agreed to be accepted shall be presented, it must be presented within a reasonable time.

SAME—UNREASONABLE DELAY IN PRESENTATION.—Delay of more than a year in the proper presentation of a draft agreed to be accepted, is unreasonable.

*Mr. Bacon,* for plaintiff.

*Needham & Miller,* for defendants.

v.2,no.7—39

DYER, D. J.  This is an action upon a special contract. The facts in the case are these: Immediately prior to October 11, 1877, J. Buckingham & Brother, a firm doing business at Lacon, in this state, arranged with the defendants, who were engaged in the business of receiving and dealing in live stock in this city, that the defendants should pay a draft which Buckingham & Brother should draw on account of certain shipments of live stock, with bills of lading attached; and pursuant to the arrangement thus made the defendants, on October 11, 1877, sent to the cashier of the plaintiff bank a telegraphic dispatch in the following words: "We will pay J. Buckingham & Brother's draft, bill of lading attached, for three cars of cattle and one of hogs." [Signed] BENSLEY, WAGNER & BENSLEY.  On receipt of this telegram the plaintiff bank paid to J. Buckingham & Bro. $4,232.35, being the value of the three car loads of cattle and one of hogs.  At the same time the bank received from Buckingham & Bro. a draft dated October 12, 1877, upon the defendants, for the sum named, which draft was signed "A. D. Buckingham & Bro."

There is no doubt, upon the testimony, that these moneys were thus advanced by the bank upon the faith of the dispatch received from defendants; and it is shown that the funds thus obtained from the bank were used by Buckingham & Bro. in the purchase of the stock.  On the eleventh of October two car loads of stock were shipped to Chicago upon the Chicago & Alton Railroad from La Rose, and on October 12th two other car loads of cattle were shipped from Lacon. The stock shipped from La Rose was forwarded under bill of lading running to one Samuel McCully, and was consigned to McCully at Chicago, the circumstances of this shipment being that at the same time McCully was shipping a car load of stock on his own account, and as John Buckingham, the member of the firm of Buckingham & Bro. who gave active attention to the business, was unable to attend personally to the shipment of the stock, it was arranged that McCully should load and take care of the stock shipped from La Rose for Buckingham & Bro.; and by arrangement between Mc-

Cully and the station agent at La Rose, in the absence and at the time without the knowledge of Buckingham, the stock was consigned to McCully and the bill of lading made as before stated, but with the understanding that, on its arrival in Chicago, McCully should turn the stock over to Buckingham, or to his commission agent.

The stock shipped by Buckingham & Bro. from Lacon, October 12th, was forwarded under bill of lading running to A. D. Buckingham & Bro., and was consigned to them at Chicago. The cashier of the plaintiff bank testifies that when the draft was drawn, and the money advanced on account of it to Buckingham & Bro., bills of lading were attached to the draft and were sent with the draft to the Union Stock Yards National Bank of Chicago. As there do not appear in evidence any other bills of lading than those described, the conclusion is that the bills of lading which were attached to the draft when it was forwarded, if any, were those which have been mentioned. The car loads of stock covered by both bills of lading duly arrived in Chicago, and came to the hands of the defendants, who sold the same.

It appears, further, that as the draft which Buckingham & Bro. had drawn on the defendants was signed *A. D.* Buckingham & Bro., and as the telegraphic dispatch from defendants to the plaintiff bank stated that they would pay the draft of *J.* Buckingham & Bro., it was feared that the defendants would not honor the draft, and so, three days later, Buckingham & Bro. delivered to the plaintiff bank a second draft, for a like amount with the first, upon the defendants, which was signed J. Buckingham & Bro. The proceeds realized by the defendants upon the sale of the four car loads of stock amounted to $3,891.25, and this amount, less defendants' charges, was paid to the bank, and appears to be indorsed on the draft secondly drawn.

It appears that the firm of Buckingham & Bro., in the transaction of their business, used the firm name of J. Buckingham & Bro. and A. D. Buckingham & Bro. interchangeably; and concerning the La Rose shipment it appears also that, as McCully desired to use the railroad pass which Buck-

ingham & Bro. had, it was deemed necessary that the stock shipped from that point should be shipped in the name of McCully.    Concerning the receipt by the defendants of the stock consigned to McCully, McCully testifies that on his arrival in Chicago he explained to one of the defendants the circumstances under which the stock was shipped in his name, and gave to the defendant with whom he had the conversation an order to sell the stock on account of J. Buckingham & Bro., telling him at the same time that he (McCully) had no interest in the stock.    The witness Buckingham has also testified that he telegraphed the defendants to receive the stock shipped in the name of McCully, and that this was done in the evening of the eleventh or on the morning of the twelfth of October.    There is no doubt that the entire four car-loads of stock came, in the manner stated, to the possession of the defendants.

The defendant Wagner, in his testimony touching the sales of the four car loads of stock, and the account of sales which the defendants rendered, says that the defendants did not authorize the indorsing of the amount which they paid to the bank upon the draft which Buckingham & Bro. had drawn upon them, but that the accounting and payment were made according to the ordinary course between commission men and the owner of the property, and not to apply upon the draft.    On presentation of the draft of October 12th, such presentation being made on the 13th, payment was refused; and the same result followed the presentation of the second draft of October 15th.    It has been stated that the testimony of the cashier of the plaintiff bank is that at the time the first draft was drawn and the money advanced to Buckingham & Bro. the bills of lading were attached to the draft.    From the testimony of the defendant Wagner it appears—and his statement on the subject is positive—that when the draft was presented for payment no bills of lading were attached.    And it appears, further, that, in order to obviate difficulties supposed to arise from previous presentations of the drafts to the defendant in connection with the bills of lading, the plaintiff bank, on the seventeenth day of December, 1878, more than

a year after the original transaction, caused a draft dated October 15th to be again presented to the defendants for payment, with the two bills of lading, which have been previously described, attached thereto.

There resulted from the sale of the stock a loss which was the difference between the amount of the draft and the amount realized for the stock. This difference the defendants were called upon to pay. Payment was refused, and this action was brought. It will be noticed that this action is not brought to recover from the defendants the value of the stock which they received and sold, nor the proceeds of the sales. The action proceeds upon the contract originally made between the parties, which was special in its character; and it is insisted by the plaintiff, upon the foregoing facts in the case, that the defendants are liable upon the draft which Buckingham & Bro. drew upon them and delivered to the bank.

The case, so far as legal principles are involved, lies within very narrow compass. The agreement of the defendants, as expressed in their telegram to the bank, was not simply an agreement to pay Buckingham & Bro.'s draft. It was an agreement on their part to pay J. Buckingham & Bro.'s draft with bill of lading attached, and, therefore, their promise was conditional. Its nature, in this regard, was communicated to the bank. All parties were advised that compliance with the terms named by the defendants was essential if the drawers and the bank would have the draft honored on presentation; and it is the fair meaning of the language used in the dispatch that bills of lading should accompany the draft upon its presentation for payment. It was necessary, in order to hold the defendants upon their special promise, that the draft should be drawn as they directed—that is, in the name of J. Buckingham & Bro.—and that proper bills of lading should accompany the draft. The presumption is that the condition thus prescribed by the defendants was imposed for their protection, and that they would pay the draft only in case bills of lading accompanied it; and the court cannot construe their agreement otherwise without de-

priving them of the benefit of the condition upon which they agreed to pay the draft. The value of a bill of lading as a security is well understood. That value lies in the fact that the property upon which advances are made is in the possession of a carrier under an agreement on its part to deliver the property to the consignee named, and that, on presentation of the bill of lading by the consignee or his assigns, the property upon its arrival will be delivered to him. Various advantages, not necessary to mention, may·accrue to the consignee of the property who holds a bill of lading for the same; and it must be presumed, from the language of the dispatch which the defendants sent to the bank, that they desired to secure to themselves such advantages.

It is, I think, enough to say that, to entitle the plaintiff to recover, it must stand upon the letter of the contract which it seeks to enforce, and must therefore show full compliance on its part with the terms of the contract, in order to enforce it against the defendants. It was said, upon the argument, that there was a substantial compliance on the part of the bank, and the ground thus taken by counsel struck me with a good deal of force. The difficulty, however, is that, as the defendants stated the precise terms upon which they would pay the draft, substantial compliance only results when there has been a literal compliance with such terms. It is one of those cases where parties have stated a condition upon which they will do a certain thing, and it therefore becomes essential that the precise condition named be performed, in order to hold the party to liability upon his specific agreement. I do not refer to authorities upon the question, because the elucidation of the point seems free from difficulty. It is quite plain that the terms of the agreement, under which the defendants promised to pay the draft, were not complied with.

Upon the testimony I think it must be determined that bills of lading did not accompany the draft when it was first presented for payment, and, moreover, the bills of lading upon their face, the one running to McCully and the other to A. D. Buckingham & Bro., did not meet the requirements

of the contract. There was a substantial deviation from the terms upon which the defendants stated that they would pay the draft, and which, I think, relieved them from liability upon the draft; and their acceptance of the stock under the circumstances which have been stated, and the account of sales which they rendered, and payment of the proceeds realized from such sales, did not, in my judgment, establish such liability. Their payment was not made on account of the draft. Nothing in the case shows that they have at any time, since they first refused payment of the draft, recognized it as a binding obligation upon them. Nor do I think that the subsequent presentation of the draft, with these bills of lading attached, more than a year after the transaction, can avail the plaintiff. No time was specified by the defendants when the draft should be presented for payment. The law, therefore, implies that it was to be presented within a reasonable time, and it cannot be held that presentation in December, 1878, was seasonable, so as to avail the plaintiff in the prosecution of this action.

It was suggested on the argument that the defendants suffered no loss for want of bills of lading; that the property in question came to their hands, and that they were enabled to deal with it as effectively, as if there had been literal compliance with the contract under which the defendants agreed to pay the draft; but this does not answer the objection that, as this is an action to enforce a special and conditional contract against the defendants, there is devolved upon the plaintiff the necessity of showing an actual compliance on its part with the terms or conditions of that contract.

It follows from these views that judgment must be rendered in favor of the defendants.